IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>　　　　　　　　Respondent,<br><br>　　v.<br><br>JARED C. CORSON,<br><br>　　　　　　　　Appellant. | No. 83829-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Jared Corson, a former Everett police officer, appeals his conviction of stalking his ex-girlfriend, S.J.P. We disagree with Corson that there was insufficient evidence to support the conviction but accept the State's concession that the trial court erred in imposing three consecutive terms of probation. We affirm in part, reverse in part, and remand to the trial court to correct the term of probation.

FACTS

Corson, then a patrol officer with the Everett Police Department, first met S.J.P. when responding to a call near the coffee stand where S.J.P. worked. The two began a romantic relationship in April or May 2019. Corson was married to another woman during the entirety of their relationship.

Throughout the summer of 2019, S.J.P. expressed doubts about the relationship

Citations and pincites are based on the Westlaw online version of the cited material.

and concern that Corson remained married.  In response to these doubts, Corson sent multiple texts professing his love and commitment to S.J.P.  He wrote in June, "if you want to separate me from you, I'll do whatever for you.  But just know, like a knight, I will stand guard to your castle for the rest of my life . . ."  In July he wrote, "You can let go of me.  But I'm not even close to that yet with you" and "you'll never lose me. . . never" followed by "Well unless I die of course".  He also wrote, "If I lose YOU my life will never be the same.  My love/heart is fully invested in YOU.  So i got everything to lose."  The same night he wrote, "It will take a miracle for me to let US go.  Period." About a minute later he wrote, "Like I die, or you die, or something drastic" followed by, "YOU are my everything girl, and more." and "And every moment of everyday all I want is YOU".

In August, after S.J.P. again expressed doubts about the relationship and was "angry, hurt, sad" toward Corson as a romantic partner, Corson arrived uninvited to the birthday party of S.J.P.'s friend, Kaiya Jones, in an effort to repair the relationship.  At that party, S.J.P. ran into D.R., an acquaintance from high school, and later developed romantic feelings for him.  Later that month, S.J.P. discovered that Corson's wife had been pregnant and miscarried their child in late July.  S.J.P. sent Corson multiple texts on August 21.  She told him, "Please don't talk to me at all.  I'm done" followed by "I mean it this time."  She wrote,

> Sorry for you and Erica's loss.  My heart is officially shattered.  I don't even know what to say.  I don't know how to feel.  I don't trust you.  I feel like I'm going to throw up.  I need you to just stay away from me.  Everyone was right.

At the end of August, S.J.P. texted Corson that she was interested in dating someone else.  She did not tell Corson the name of this person for a "long time."  S.J.P. and D.R. spent more time together and began dating that fall.

2

After S.J.P. and D.R. started dating, Corson discovered D.R.'s name and used resources available to him as a police officer to uncover information about D.R. A short time later, S.J.P. met Corson for coffee, where they discussed her new relationship and Corson became upset. Corson told S.J.P. that he knew D.R. was living at his mother's home and told her that D.R. had previously been arrested on charges related to cannabis. When S.J.P. learned that Corson knew these details about D.R., she felt afraid because Corson's measures to investigate D.R. were "not a normal thing to do" and she was worried about D.R.

D.R. had previously been convicted of the illegal manufacture of cannabis in Grays Harbor county in early 2019. The county had a pending civil asset forfeiture case following that conviction in which the county was attempting to prove that a vehicle and $60,000 in cash seized from D.R. were obtained as the result of proceeds from D.R.'s illegal conduct.

On September 8, Jones received a text from someone claiming to be a friend of a friend named "Rus" asking for D.R.'s phone number. Jones provided the number. D.R. subsequently received a call from a man who identified himself as "Russ" claiming to be a friend of Jones asking to purchase drugs from D.R. Corson later sent a recording of this phone call to S.J.P. stating he wanted her to "know who [D.R.] was." A few weeks later, Corson admitted to Jones that he had pretended to be someone else in order to convince her to send him D.R.'s phone number.

On September 9, S.J.P. sent a text to Corson explaining she did not want to be with Corson and that she did not trust Corson anymore "because you dug up information that had nothing to do with you and I don't want to talk to [D.R.] either

because I don't want to deal with all the drama.  So that's it.  I'm done".

The next day, Corson sent a text asking if they could talk, to which S.J.P. responded, "No."  Corson continued to send texts to S.J.P.  S.J.P. later wrote,

> You're right I am mad at you for it.  Because you could have ruined someone's life.  You put him under a light that he didn't need to be under.  He hasn't been dealing he has a bad past but a bad past doesn't mean you're a bad person.  If someone is willing to change then don't ruin there chances, of becoming a better person.

She also wrote, "Why would you call about him?!  Why would you dig up enough to find out who I was seeing.  Obviously I didn't tell you a name because it doesn't matter.  I don't care who you talked to youre insane for doing that . . ."  S.J.P. told Corson that she thought he was trying to build "a case" against D.R. "or something."  S.J.P. followed up stating, "I'm pissed.  Please leave me alone."

On September 18, Corson sent a lengthy text to S.J.P. stating in part,

> All Saturday and Friday night I gave you space like we agreed.  Trying to keep my thoughts positive and full of hope.  But I was fucking freaking out.  Sunday was our 10 month anniversary of when we met at 41st.  I know anniversaries and birthdays are very special to you, and your past boyfriends have always failed you in making them special.  So before I went to work, I woke up early and drove over to Met Market, open 24 hours, and bought you yogurt, blueberries, and flowers.  I hand wrote a little card to you and drove over to Kaiyas.  When i walked up to the front door I saw [D.R.]'s fucking car.  So many horrible thoughts went through my head, and I knew he was at that exact moment probably snuggling my best friend, my lover, my everything, in Kaiyas bed.  I didn't know it was [D.R.], but I had a feeling in my gut.  So yeah, I got the plate number.  And left in a rage.  I threw everything I bought for you in the trash at my work because I was so angry/hurt.  At that moment I was done.  I could never be on the bachelorette.[1]  At work I ran that plate number and it was [D.R.].  I was furious that you were not honest with me.  And he had a awful record, an FBI record, which is not normal.  I was angry but yet so worried that my pure hearted best friend would be so blinded by this boy.  Because no offense, you did not see that a man living at his parents and being jobless at 27, using coke a few weeks earlier and being fresh out of

---

[1] The Bachelorette is a reality television show where one woman dates multiple men at the same time.

prison were not warning signs.  And I was beyond hurt to think you were assessing this guys compatibility/safety/security and love over mine, and after I had finally just destroyed, my wife/marriage, for you to prove my love and intentions.

Not wanting to make a stir I called my buddy Jonny with king county.  It was very disturbing to know that as soon as he looked his name up, he knew exactly who [D.R.] was.  He told me they keep a eye on him, his house, brother, and others he was involved with.  And that they already have cases in the works, and one of the cases had something to do with a controlled buy.  He told me what [D.R.] was last arrested for and went to prison for.  He gave me [D.R.]'s brothers info and [D.R.]'s address and vehicles attached to them . . .

S.J.P. texted back,

I wish I could say I trusted what you just wrote but I don't.  Because I feel like you were really selective with your words.  Good job putting something in writing is that part of your "good cop skills" I don't like possessive it scares me and I don't like someone thinking they can control my life either.  And just so you know I didn't help him with any text.  I don't have anything to say to you, I just don't trust you and trust is everything to me.  So please leave me alone.

Corson continued to bombard S.J.P. with texts over the next few days before she

sent back a text on September 26th stating,

I think I need to be honest with you and I need to be blunt.  I don't want anything with you right now, I don't know if I ever will again.  I feel like there's no trust anymore.  There's a lot of drama a lot of hurt and a lot of damage.  I love you as a person but I fell out of love a while ago and I felt it that last day we hung out.  You'll always mean a lot to me.  But I truly want you to figure it out with your wife.. please quit talking to my friends and family.  Quit showing up at my work, buying me gifts, sending me prayers and long messages.  I'm just not there.  I have feelings for another person, I can't deny them and I just want to see where it goes.  I hope you understand.  I hope you don't do anything irrational.  I hope you can love me and respect me enough to walk away.  I'm sorry I broke your heart but my feelings aren't there anymore.  Please PLEASE try to get yourself healthy and move on with your life.  Please leave me alone.  I feel like I'm being trapped and like it's being forced on me and it's making me have a mental break down almost everyday.  I need this to stop now.  No more.  Because for my own health I might have to get a restraining order.  I made a promise, I want to keep it.  Cutting all ties.  Please stop Jared.

S.J.P. continued to respond to Corson's texts through September and October by

asking him to leave her alone and give her space.

Some time between September and October of 2019, Corson contacted chief criminal deputy Kevin Schrader of Grays Harbor County Sheriff's Department. Corson identified himself as an Everett Police Officer and asked about D.R. Schrader filled him in on their investigation of D.R., including the pending civil investigation to determine if seized assets that included $60,000 in cash and D.R.'s car were purchased or obtained as a result of proceeds from an illegal grow operation. Schrader testified at trial that if D.R. was involved in some criminal activity, such as earning money from illegal drug activity, it would probably help their civil case. Schrader explained that there was no pending criminal investigation against D.R.

On October 14, a commercially available location tracking device was activated at Corson's home address. The subscription accompanying the device was also registered to Corson's address. Three days later the device's location tracking showed that it traveled from Corson's address to a North Bend address where D.R. lived. On October 23, Corson sent S.J.P. a text saying he needed to talk and asking her to call him '[b]ecause you've [sic] relationship with [D.R.] has put me in a situation at work." S.J.P. responded by calling Corson a "liar," telling him not to talk to her and stating she would be filing a restraining order against Corson. S.J.P. changed her phone number that day so Corson could no longer contact her.

After this, Corson stole a license plate from a woman who drove a similar car to D.R. and attached it to D.R.'s vehicle. Corson then called the owner of the plate to inform her that she should report the license plate as stolen, which she did. On November 1, Corson emailed King County Sheriff officer Bradley Smith and informed

him that D.R.'s car had a different license plate than that registered to the vehicle, suggesting that Smith wait for D.R. outside of D.R.'s storage unit and "detain [him] for the swapped plate and maybe catch him in the act of moving some drugs/cash." Corson also contacted various other law enforcement agencies, telling them that he was investigating D.R for drug trafficking and asking for their assistance. Corson told these agencies that he had surveilled D.R. while Corson was off duty, referring to it as "[D.R.] watching" and said that he was concerned because D.R. was dating the daughter of Corson's family friend. None of these agencies opened an official criminal investigation into D.R. based on Corson's requests.

On November 8, D.R. was pulled over on I-5 near Tumwater while he and S.J.P. were traveling to Oregon to visit her family. Prior to this stop, D.R. was unaware that a different license plate had been attached to his car. A Washington State Patrol officer stopped the vehicle and informed D.R. that he was lucky the officer had not pulled him over at gunpoint for having a stolen license plate on his car. The officer allowed D.R. to remove the plate from his car, believing that D.R. was unaware it had been reported stolen, and let D.R. go. Corson called the officer asking about the traffic stop immediately after D.R. left the scene. Corson told the officer that he had been investigating D.R. for drug possession and expressed disappointment that D.R. had not been arrested for possession of stolen property, stating D.R. could have spent the night in jail.

Following the traffic stop, S.J.P. sent a text to Corson's sister requesting that she ask her brother to stop harassing both S.J.P. and D.R. S.J.P. stated that the "situation has gotten out of control" and that Corson was watching D.R. and contacting her family

7

and friends. S.J.P. told the sister that she wished Corson "would see the boundaries he has crossed (as a cop) because he has given me explicit information about my boyfriend and his situation that he is in from previous charges and even telling me that he is being watched now too and by whom." S.J.P. also stated, "I know it sounds crazy but I know [Corson] set him up with that license plate thing." S.J.P. also sent a text to Corson's sister stating,

> It's ok.. like I said I just really want it to stop. It's more of [D.R.] being harassed than it is me. He's trying to get to me through people. But he has been trying to get [D.R.] in trouble and that's not ok. He has even admitted that to me. I just don't want [D.R.] to get a no contact order on him because I really can't control that one. And he has all the text proof of him going to Kaiyas and recording his license plate and looking him up on his work computer. Stuff like that. I just don't want this to get worse than it needs to, ya know? I'm trying to do this the right way.

Approximately one month later, S.J.P. texted Corson's sister stating, "I have proof of everything.. I'm not comfortable in my own skin because of him he makes me feel terrified."

S.J.P. applied for and was granted a temporary protection order against Corson near the end of December. S.J.P. sought the order because she was concerned for D.R.'s safety based on the texts sent by Corson. A few weeks later, D.R. became suspicious after he noticed that he had been followed by police in the time since the November traffic stop. S.J.P. was similarly concerned based on the texts from Corson indicating that he knew where D.R. was, people following D.R., and the fact that Corson at one point knew D.R. was at a casino. The two looked under D.R.'s car and found the tracker placed by Corson. They turned the tracker over to the Monroe Police Department. A Monroe police officer who subsequently interviewed S.J.P. observed that she was "pretty upset", "very emotional," "nervous," and "scared."

Corson was subsequently charged with stalking (domestic violence), perjury in the first degree, official misconduct, and a privacy act violation. The State alleged in the stalking charge that S.J.P. "was placed in reasonable fear that the defendant intended to injure the person or property of another." After the State rested during trial, the court granted Corson's motion to dismiss count two, the stalking charge, only as to a reasonable fear that Corson intended to injure S.J.P. However, the court allowed the State to proceed in regards to S.J.P. having a reasonable fear that Corson intended to injure the property of another. At trial, Corson was convicted of all counts except perjury. He was sentenced to three consecutive 24-month terms of probation for each count.

Corson appeals the stalking conviction and his sentence.

## DISCUSSION

### Stalking

Corson first challenges the sufficiency of the evidence supporting his stalking conviction.

Evidence is sufficient to support a criminal conviction if, "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)). "A sufficiency challenge admits the truth of the State's evidence and accepts the reasonable inferences to be made from it." State v. O'Neal, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007). "Direct evidence is not required to uphold a jury's verdict; circumstantial evidence can be sufficient." Id. at 506.

We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence. State v. Longuskie, 59 Wn. App. 838, 844, 801 P.2d 1004 (1990).

The jury was instructed that to convict Corson of stalking, in violation of former RCW 9A.46.110(1) (2013), the State was required to prove beyond a reasonable doubt

> (1) That on or about the 8th day of September, 2019 to on or about the 13th day of January, 2020, the defendant intentionally and repeatedly harassed or repeatedly followed S.J.P;
>
> (2) That S.J.P. was placed in reasonable fear that the defendant intended to injure the property of another;
>
> (3) That the feeling of fear was one that a reasonable person in the same situation would experience under all the circumstances;
>
> (4) That the defendant knew or reasonably should have known that S.J.P. was afraid, intimidated, or harassed even if the defendant did not intend to place her in fear or to intimidate or harass her;
>
> (5) That the defendant acted without lawful authority; and
>
> (6) That any of these acts occurred in the State of Washington.

Former RCW 9A.46.110(4) states that "attempts to contact or follow the person after being given actual notice that the person does not want to be contacted or followed constitutes prima facie evidence that the stalker intends to intimidate or harass the person." The statute defines contact as "any" form of contact or communication, including "the sending of an electronic communication to the person." Former RCW 9A.46.110(4). "'Harasses' means unlawful harassment as defined in [former] RCW 10.14.020 [(2011)[2]]." Former RCW 9A.46.110(6)(c). The court instructed the jury that

> "To harass" means to carry out a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or

---

[2] Effective July 1, 2022, (after the charging period here) RCW 10.14.020 was repealed and reenacted at RCW 7.105.010(6)(a). LAWS OF 2021, ch. 215, § 2, § 170.

harasses, or is detrimental to such person, and which serves no legitimate or lawful purpose. The course of conduct must be one that would cause a reasonable person to suffer substantial emotional distress and which actually causes the person to suffer substantial emotional distress.

"Course of conduct" means a pattern of conduct composed of a series of acts over a period of time, however short, demonstrating the same purpose.

"Willful" or "willfully" means to act purposefully, not inadvertently or accidentally.

Corson argues that the evidence shows nothing more than a painful breakup between S.J.P. and Corson, not stalking. He contends that there is "no evidence of substantial emotional distress on [S.P.J.'s] part or conduct by Corson directed as such." Corson argues that the State did not present evidence of the "nexus" between D.R.'s property and S.J.P.'s fear. We disagree.

It is undisputed that between September 8, 2019, and October 23, 2019, when S.J.P. changed her phone number, S.J.P. told Corson to leave her alone or give her space on 10 occasions. Evidence also established that Corson's jealously over D.R. drove Corson to continue to contact S.J.P. and tell her what a bad guy D.R. was and how Corson was able to use his law enforcement contacts to keep an eye on D.R., his house, brother and others he was involved with. Corson had told S.J.P. "explicit information" about the previous charges against D.R., which included a conviction and prison sentence for cannabis manufacturing as well as a civil asset forfeiture case in which his vehicle and thousands of dollars in cash were seized from him. During the course of their relationship, Corson had previously shared with S.J.P. that he had "helped task force get a house with 15 pounds of meth" and told her there was "45k cash" and "guns."

S.J.P. believed Corson was trying to build a case against D.R. and get him in

11

trouble by putting him "under a light that he didn't need to be under."

When Corson told S.J.P. about his contacts with other law enforcement about D.R., S.J.P. again told him to leave her alone and told him his possessiveness scared her. She also later told him, "I feel like I'm being trapped and like it's being forced on me and it's making me have a mental break down almost everyday. I need this to stop now. No more. Because for my own health I might have to get a restraining order." S.J.P. also texted Corson's sister stating, "I'm not comfortable in my own skin because of him he makes me terrified." S.J.P. did obtain a temporary protection order against Corson because she was scared for D.R. After S.J.P. found the tracker Corson placed under D.R.'s car and turned it over to the Monroe Police Department, an investigating officer observed that S.J.P. was "pretty upset," "very emotional," "nervous," and "scared."

A jury could have found Corson's course of conduct did cause S.J.P. to suffer substantial emotional distress and placed her in reasonable fear that Corson intended to injure D.R.'s property by trying to get him in trouble with other law enforcement agencies. S.J.P. knew Corson had been involved in seizure of property before. Corson specifically contacted the agency with a pending civil asset forfeiture case. Sufficient evidence supported the conviction of stalking.

<u>Probation</u>

Corson next argues that the trial court erred by imposing three 24-month terms of probation, one for each gross misdemeanor conviction, to be served consecutively, totaling six years of probation.

The trial court lacks the inherent authority to suspend a sentence and must be

granted that power by the legislature. State v. Parent, 164 Wn. App. 210, 212, 267 P.3d 358 (2011). RCW 9.92.060 and RCW 9.95.210 grant the trial court the discretionary authority to suspend a defendant's sentence and place the defendant on probation. Under RCW 9.95.210(1), the sentencing court has the authority to impose only 24 months of probation regardless of the number of counts. State v. Rice, 180 Wn. App. 308, 314, 320 P.3d 723 (2014).

Here, the trial court sentenced Corson to three terms of 24 months' probation, one term for each of the three gross misdemeanor convictions, to be served consecutively, for a total of 72 months' probation. This exceeds the 24-month limit imposed by Parent and Rice. The State concedes that the trial court erred in imposing consecutive terms of probation.

We hold that the trial court erred and reverse the trial court's imposition of three consecutive terms of 24 months' probation. We remand to the sentencing court with instruction to correct the term of probation. See State v. Rodriguez, 183 Wn. App. 947, 959-60, 335 P.3d 448 (2014).

## CONCLUSION

We affirm Corson's conviction of stalking, but reverse his sentence and remand to the trial court to resentence by correcting the term of probation.


WE CONCUR:

_____ Colburn, J.

_____     _____ Mann, J.
Bowman, J.

13